302 F.Supp. 1376 (1969)
Curtis L. MANN, Trustee of the Estate of Edward William Kline, Bankrupt, Plaintiff,
v.
CLARK OIL & REFINING CORPORATION, a Corporation, Defendant.
No. 68C 390(3).
United States District Court E. D. Missouri, E. D.
June 24, 1969.
*1377 Sheldon D. Grand, Clayton, Mo., for plaintiff.
John Morris, St. Louis, Mo., for defendant.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
In this action tried to the Court, the trustee in bankruptcy of Edward William Kline seeks to recover the amount of certain alleged preferential transfers made to Clark Oil and Refinery Corporation. We have jurisdiction under the Bankruptcy Act.
Pursuant to his voluntary petition in bankruptcy, Kline was adjudicated bankrupt on March 11, 1968. The questioned transfers were made in early December, 1967. The facts have been stipulated.
On April 30, 1966, Kline leased from Clark the service station premises and the equipment therein located at 6400 Gravois, St. Louis, Missouri. On the same day the parties entered into a Retail Dealer Consignment Agreement. At the time the two instruments were executed, Kline posted as security the sum of $500, of which defendant has received the benefit, the propriety thereof not being in dispute. The lease granted Kline a "franchise" to use the Clark identification, colors, and the trade name of "Clark Super 100" in connection with all gasoline sold from the demised premises. The lessee was "free" to purchase products for resale from other suppliers, but if he did so, he was obligated to discontinue the use of Clark's trade name, trademark and color scheme. The agreed rental was a sum equivalent of 1½ cents "for each gallon of gasoline (sold from) or (delivered to) the demised premises each month during the term of the lease, the rental to be paid "as, when and in the manner from time to time specified in writing by the Lessor." By the Retail Dealer Consignment Agreement, which was on a printed form, Clark agreed to deliver such quantities of its gasoline as Kline might require from time to time on the conditions *1378 set forth. On December 4, 1967, Clark and Kline terminated both the lease and the Agreement.
Four transfers from Kline to Clark are involved in this action:
(1) Kline's weekend receipts (December 1 to 3, 1967) from the sale of products at his service station in the total amount of $1,400. Of this sum $1,250 represented sales of Clark gasoline, while the balance of $150 was from sale of property unquestionably belonging to bankrupt.
(2) Miscellaneous products of the value of $537.61 belonging to bankrupt which had been sold to him on open account by Clark and others and which were transferred to Clark on December 4, 1967, on termination of their relationship.
(3) Clark gasoline of the value of $630 which was on the filling station premises on termination on December 4, 1967.
(4) $500 paid by check dated December 5, 1967. The transfers of the property which was admittedly the bankrupt's resulted in a depletion of the bankrupt's estate. Clark credited Kline's account with the $500 check and the Kline merchandise valued at $537.61, aggregating the sum of $1,037.61.
With respect to all of the aforesaid transfers:
(1) The transfer was for the benefit of Clark.
(2) At the times thereof, Clark was a creditor of the bankrupt in the amount of $2,900.54 for merchandise previously sold to bankrupt by Clark, this sum not including the gasoline above referred to.
(3) Kline was insolvent at the time thereof and Clark had reasonable cause to believe that he was insolvent.
(4) At the times thereof, and also at the time of bankruptcy, Kline had insufficient assets to make proportionate transfers to other creditors, and no such proportionate transfers were in fact made.
(5) The assets in the bankruptcy estate are insufficient to satisfy the claims of all creditors.
It is apparent that the transfers fall into two different categories, gasoline and non-gasoline. We first consider the three non-gasoline transfers, consisting of (1) weekend receipts of $150, representing sales of bankrupt's admitted property (2) miscellaneous products valued at $537.61 and (3) check in the amount of $500. These transfers aggregate $1,187.61. Defendant has advanced no reason whatever to support its claim to these items. Clark was simply a general unsecured creditor (as to these transfers). It is clear that the transfers were preferential transfers within the meaning of Section 60(a) and (b) of the Bankruptcy Act. Every element of a preferential transfer is spelled out in the agreed stipulation of facts.
The remaining two transfers pose different problems. These transfers consist of (1) weekend receipts of $1,250 from the sale to consumers of Clark gasoline on the station premises, and (2) Clark gasoline on the premises on termination of the lease of the value of $630. Defendant bases its right to these items on the terms of the Retail Dealer Consignment Agreement. The parties have stipulated that the only evidence available concerning the intent of the parties to that agreement is the agreement itself. Sub-paragraph 5 of Paragraph SECOND thereof provides as follows:
"The Consignor will deliver to the Consignee gasoline at the posted Dealer Tank Wagon price, said merchandise will be consigned to the Consignee and will be and remain the property of the Consignor until sold by the Consignee in the ordinary course of business at said station, to retail customers thereof. The Consignee agrees to hold Consignor's portion of the proceeds of all such sales of consigned merchandise in trust, as agent for the Consignor, and will mail daily to the local field office of Consignor a cashier's *1379 check, money order, or certified check as Consignor may direct, in a sum equivalent to the posted Dealers Tank Wagon price of all gasoline sold, used, lost, stolen or otherwise disposed of at said station for the preceding day. In the event Consignor directs Consignee to use a certified check, then Consignee is permitted to deposit Consignor's funds in his personal bank account for the sole purpose of simultaneously obtaining such certified check, payable to Consignor for its share of the proceeds. It is the express intent of Consignor and Consignee that said deposit of funds will not be commingled in any way with funds of Consignee, other than for the sole purpose of obtaining such certified check. Consignee agrees that simultaneously with said remittance, Consignee will mail to the local field office of the Consignor, a true and correct daily consignment report itemizing quantity of consigned gasoline, sold, used, lost, stolen or otherwise disposed of for the preceding day and the value thereof based on the posted dealer price above described, all of which shall substantiate each remittance made."
"Consignee agrees that the margin or differential on his posted retail tax-included price over and above Consignor's posted dealer tank wagon price shall never, under any circumstances, be less than .03 per gallon.
"Consignee agrees to assume all risks with respect to robberies or holdup losses, and agrees to be responsible to the Consignor for all loss, disappearance or damage to the gasoline products consigned by the Consignor to the Consignee under this agreement. The parties agree that if Consignee desires to purchase gasoline of the Consignor on a cash basis or if Consignor shall extend credit for purchases of gasoline to Consignee upon five (5) days written notice from Consignee to Consignor, this agreement shall be rendered null and void." Prior to termination, Kline's margin or differential on his posted retail tax-included price over and above Clark's posted dealer tank wagon price was 5.25 cents per gallon.
The Uniform Commercial Code of Missouri, which was in effect at the time of the transfers, is determinative of the rights of the parties. Section 400.2-326, sub-section (3), V.A.M.S., provides in part that "[w]here goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as `on consignment' or `on memorandum'". In this connection, sub-section (2) of this Section provides that "goods held on sale or return are subject to [the claims of the buyer's creditors] while in the buyer's possession." The statute sets forth three situations in which sub-section (3) is not applicable, but none of them are here involved.
Hence, treating the Retail Dealer Consignment Agreement as a "true" consignment thereby coming within the provisions of this section, the only substantial question is whether Kline, to whom the gasoline was delivered for sale, was dealing in that product "under a name other than the name of" Clark. There being no other evidence on the subject, we are required to make this determination solely on the basis of photographs of Kline's place of business (which were taken after the premises were subsequently leased to another dealer) as modified by the agreement of the parties that at the times here involved bankrupt's name was on the doorway as "dealer". The photographs, of course, identify the filling station as a Clark *1380 station, that is, one which sells Clark brand gasoline, but, more importantly, the name of bankrupt was clearly visible and his name was identified as the "dealer", the person who was conducting the business.
In our opinion, Kline was not doing business under the name of his supplier, any more than any other gasoline dealer who sells branded gasolines on his own account at a station identified as one at which a particular brand of gasoline is sold. What the statutory phrase has reference to is a situation where the consignee has completely identified his business with that of the consignor to such an extent that potential creditors would necessarily assume that the business was that of the consignor solely. The language of the lease and the Agreement evidences the intention of the parties that Kline's business be independent of Clark, and these contracts are inconsistent with the complete identification of names and business contemplated by the statute. The purpose of the statute is to protect creditors of the dealer, the person in possession of the goods, who would have a right to assume that the goods were the property of the dealer. There is no contention that creditors of Kline dealt with him on any other assumption. Having expressly represented to the public that the business was his, by the use of his name and the word "dealer" appearing over the door to his premises, it is clear that Kline was in fact doing business under his own name. Hence, treating the agreement as a "true" consignment, it follows that as against the claims of Kline's other creditors, Clark may not rely on its purported reservation of title to the gasoline.
We are also of the opinion that under Section 400.1-201(37) V.A.M.S., the Retail Dealer Consignment Agreement was actually intended as a security agreement. The definition of "security interest" is "an interest in personal property * * * which secures payment * * * of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 400.2-401) is limited in effect to a reservation of a `security interest'." This definition is limited by the further provision that unless a consignment is intended as security, a reservation of title thereunder is not a "security interest." As we have heretofore noted, the intention of the parties under the circumstances of this case may be determined only by the evident purpose derived from the instrument itself. What, then, was its purpose?
It is clear to us that the actual purpose of Clark in requiring Kline to execute the Agreement was to make certain that Clark would be paid for the product delivered to Kline out of the proceeds of the sale of the gasoline. That is, Clark wished to avoid the risks which would otherwise inhere in the transaction. In these circumstances, the reservation of title to the gasoline had no purpose other than to secure the payment for the gasoline which was delivered. Therefore, such reservation of title constituted a "security interest".
Inasmuch as Clark failed to perfect its "security interest" as required by Article 9 of the Uniform Commercial Code, such failure necessarily subordinated Clark's unperfected security interest to a creditor holding a judicial lien without knowledge of the security interest. Section 400.9-301(1). Under the Bankruptcy Act, the trustee in bankruptcy has acquired the rights of such a hypothetical judicial lien creditor. All the elements of a preferential transfer existing, it follows that plaintiff is entitled to judgment with respect to the gasoline transfers as well as to the others.
The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of plaintiff and against defendant in the sum of $3,067.62, together with costs.